**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | |
| ) | **Criminal Action No. 2022-0004** |
| **BERNARD FLAVIUS,** ) | |
| ) | |
| **Defendant.** ) | |
| ————————————————————) | |

**Attorneys:**
**Evan Rikhye, Esq.,**
St. Croix, U.S.V.I.
      *For the United States*

**Gabriel J. Villegas, Esq.,**
St. Croix, U.S.V.I.
      *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Bernard Flavius' ("Defendant") "Motion to Suppress" (Dkt. No. 32); the Government's Opposition (Dkt. No. 35); Defendant's Supplemental Brief (Dkt. No. 48); the Government's Supplemental Brief (Dkt. No. 49); Defendant's Response to the Government's Supplemental Brief (Dkt. No. 52); the Government's Response to Defendant's Supplemental Brief (Dkt. No. 53); and the evidence and arguments presented at the suppression hearing. For the reasons discussed below, the Court will grant in part and deny in part Defendant's Motion to Suppress. Specifically, the Court will grant Defendant's request to suppress his statement claiming ownership of the marijuana plants based on a Fifth Amendment violation, and will deny his Fourth Amendment challenge seeking to suppress the marijuana plants and the aerial photographs of Defendant's property.

# I.  BACKGROUND

On March 7, 2022, the Government filed an Information against Defendant. (Dkt. No. 12). The Information charged Defendant with: (1) knowingly and intentionally possessing with intent to distribute more than 100 marijuana plants, a Schedule 1 controlled substance in violation of Title 21, United States Code, Sections 841(a)(1) & (b)(1)(B)(vii) (Count 1);  and (2) knowingly using and maintaining any place for the purpose of manufacturing and distributing marijuana, a Schedule 1 controlled substance in violation of Title 18, United States Code, Sections 856(a) & (b) (Count 2). *Id.*

Defendant filed the instant Motion to Suppress, requesting that the Court suppress the physical evidence—206 seized marijuana plants and aerial photographs taken of his property. (Dkt. Nos. 32 at 2). Defendant argues that 1) a May 21, 2021 Crime Stoppers tip was stale and insufficient to establish probable cause and 2) the aerial surveillance of Defendant's property violated his rights under the Fourth Amendment. *Id. at* 1. Defendant also seeks to suppress his statement claiming ownership of the marijuana plants as violating *Miranda* and/or as fruit of the poisonous tree under the Fifth Amendment. *Id.* at 2.

At the evidentiary hearing on Defendant's Motion to Suppress, the Government presented the testimony of Task Force Officer Moses President ("TFO President"), and Defendant testified on his own behalf. The following facts emerged from the record established at the suppression hearing.[1]

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

TFO President testified that that he was forwarded a Crime Stoppers tip on January 23, 2022 that an illegal marijuana cultivation operation had been established in Estate Whim near the Police Athletic League ("PAL") building in Frederiksted, St. Croix. (Dkt. No. 46 at Tr. 3:3-Tr. 3:8).[2] On January 24, 2022, TFO President and Task Force Officer David Wyrzykowski ("TFO Wyrzykowski") visited the area. *Id.* at 8:10-8:13. Upon parking in the public area near PAL, TFO President and TFO Wyrzykowski walked along Defendant's fence line which bordered a basketball court. *Id.* at 9:14-10:12. TFO President testified that when he "looked over the fence," from a corner, he saw what appeared to be marijuana plants. *Id.* at 10:19-10:21. When he looked over the fence again, he saw another set of small marijuana plants in cups at the back of the shed area. *Id.* at 11:4-11:6. After observing the plants, TFO President said that he and TFO Wyrzykowski left the area. *Id.* at 11:10.

On January 26, 2022, TFO President conducted aerial surveillance of the property using an airplane from the DEA's Air Wing Unit. *Id.* at 12:5-12:6. During the surveillance, TFO President observed the property at approximately 2,000 ft. in the air using a camera with a zoom lens. *Id.* at 14:10-14:13; 15:24-15:25. TFO President later determined that the address of the property he observed was #59-F Whim and that Defendant resided at the home located there. *Id.* at 18:1-18:5; 28:24-29:1.

TFO President sought and received a warrant to search Defendant's property.[3] *Id.* at 18:20-18:21. On February 7, 2022, law enforcement executed the search warrant. *Id.* at 19:25-20:1.

---

[2] Although TFO President received the Crime Stoppers tip on January 23, 2022, the tip was originally provided to Crime Stoppers on May 21, 2021. (Gov't Ex. 4).

[3] TFO President applied for the search warrant based on the Crime Stoppers tip; his plain view observation of the marijuana plants from the PAL fence line; and his observations during the aerial surveillance.  (Dkt. No. 1-1 at ¶¶ 3-6).

According to TFO President, once "the area was cleared and deemed safe by the entry team," he approached Defendant and his wife on the outside of the house. *Id.* at 20:10-20:13. TFO President recalled introducing himself to the couple and handing Defendant a copy of the warrant. *Id.* at 20:13-20:18. TFO President testified that Defendant, in the presence of his wife, then made a "spontaneous utterance"—without any prompting by TFO President—stating that he owned the marijuana plants located on the property. *Id. at* 20:19-20:23. TFO President further stated that he did not ask Defendant any questions following Defendant's "spontaneous utterance." *Id.* at 20:24-21:2.

Defendant testified on his own behalf at the hearing. He admitted to growing marijuana plants on the property beginning sometime in 2021. *Id.* at 44:18-45:5. Defendant recalled that, on the morning the search was executed, Defendant saw police cars approaching. *Id.* at 45:23-46:1. He testified that, "When [I] open[ed] the door, the man that [was] driving put [his] gun on me, so I [placed] my hands up." *Id.* at 46:2-46:4. When asked by counsel whether he saw TFO President that morning, Defendant replied in the affirmative, recalling, "he [came] to me, he asked me if … [I] live there[.] I [told] him, yes." *Id.* at 46:5-46:8. Defendant also testified that he had known TFO President for a "long time" because TFO President investigated the murder of Defendant's son, was in his home during the investigation, and Defendant is married to TFO President's cousin. *Id.* at 46:14-46:24. Defendant then testified that TFO President took him and Defendant's wife near the garage and asked him, "Who is planting [the marijuana] here?" *Id.* at 46:25-47:6. Defendant said he told TFO President he was responsible for planting the marijuana, to which TFO President said, "Man, I didn't know it's you." *Id.* at 47:6-47:7. In response, Defendant said, he responded, "Well, it's me that grow it." *Id.* at 47:7-47:8. Defendant testified that TFO President did not advise him of his rights during the interaction. *Id.* at 47:9-47:10.

4

Following the hearing, the Court ordered the parties to simultaneously brief certain issues raised at the hearing.[4] After filing their respective Supplemental Briefs, each party submitted a Reply stating they had no further response to the opposing party's Supplemental Brief. (Dkt. Nos. 52 and 53).

## II.    DISCUSSION

### A.  Fourth Amendment Challenge

Defendant seeks to suppress the 206 marijuana plants that law enforcement officers recovered on his property and aerial photographs taken by TFO President arguing that: 1) the May 21, 2021 Crime Stoppers tip—that was investigated by TFO President on January 23, 2022—is stale and was insufficient to establish probable cause for the search warrant executed on his property; and 2) the warrantless aerial surveillance conducted on January 26, 2022 was in violation of the Fourth Amendment because the Government has not provided evidence that the plane was

---

[4] The issues were: 1) whether the Search and Seizure Warrant's Return and Certification sections were properly completed and filed with the Court, and if not, the consequences thereof; 2) whether the date of the Crime Stoppers' tip in relation to the date of Task Force Officer President's follow-up investigation has any bearing on the probable cause supporting the search warrant executed at Defendant's home; and 3) whether Defendant was subject to a custodial interrogation for purposes of *Miranda* when he made a statement regarding ownership of the marijuana plants to TFO President. (Dkt. Nos. 44; 46 at Tr. 91:07-Tr. 91:21).

During the suppression hearing, Defendant raised the first issue after the Government did not provide—upon Defendant's initial request—a copy of the Warrant reflecting that the Return and Certification sections were properly completed pursuant to Fed. R. Crim. P. 41(f). Defendant further raised the issue in his supplemental briefing, noting that although the Government had provided a Warrant with a signed and returned certification in supplemental discovery, it could not ascertain whether that version was the same as the one filed under seal because the Government's Motion to Unseal remained pending before the Court at that time. (Dkt. No. 48 at 1-2). The Warrant has since been unsealed by the Magistrate Judge. *In the Matter of Search of 59-F Estate Whim Frederiksted St. Croix,* Criminal Action No. 22-mj-06 (Dkt. No. 8). In addition, the Court has reviewed the Warrant that was filed under seal and finds that both the Return and Certification sections were properly completed and executed. Therefore, the first issue is resolved. The other two issues as identified above remain pending before the Court.

within "public navigable air space" when TFO President observed and photographed Defendant's property. (Dkt. No. 48 at 2-7). In his Supplemental Brief, Defendant also argues that the physical evidence must be suppressed based on the Court's decision in *United States v. Somme*, Criminal Action No. 2019-0018, 2022 WL 4365856 (D.V.I. Sept. 20, 2022). *Id.* at 6-7.

In its Supplemental Brief, the Government argues that: 1) the issue of whether the Crime Stoppers tip is stale is moot because TFO President corroborated the information during his investigation and plain view observation of the marijuana plants on the property; and 2) the aerial surveillance was not a search within the meaning of the Fourth Amendment. (Dkt. No. 49). With regard to the aerial surveillance, the Government maintains that Defendant did not have a subjective expectation of privacy because the marijuana was unconcealed and located in an open field on his property. *Id.* at 3. The Government further argues that the aerial flight over Defendant's property was 1) conducted within navigable air space consistent with Federal Aviation Administration ("FAA") regulations; and 2) unlike the situation in *Somme,* TFO President testified at the suppression hearing that the aircraft used to conduct the aerial surveillance was flying at approximately 2,000 ft. *Id.* at 8.

### 1.    Crime Stoppers Tip

### a. Applicable Legal Principles

"The threshold requirement for [the] issuance of a warrant is probable cause." *United States v. Ritter*, 416 F.3d 256, 262 (3d Cir. 2005). To conclude that an application for a search warrant is supported by probable cause, the test is simply whether there is a "fair probability that contraband or evidence of criminal activity will be found in the particular place" to be searched. *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).

### b.  Analysis

Defendant contends that the anonymous Crime Stoppers tip is insufficient to establish probable cause. (Dkt. No. 48 at 2-5). As a basis for his challenge, Defendant argues that: 1) the tip is stale because there was an almost nine-month gap between the reporting of the tip and the associated follow-up investigation by TFO President and issuance of the search warrant; and 2) certain details provided in the tip could not be corroborated by TFO President during his independent investigation.[5] *Id.* In response, the Government asserts that any concerns about the tip's staleness is rendered moot because TFO President's plain view observation of marijuana plants on Defendant's property provided "timely and direct evidence" of criminal activity occurring on the property. (Dkt. No. 49 at 3).

The Court finds that Defendant's arguments regarding staleness and TFO President's alleged inability to corroborate certain details of the tip are immaterial to establishing probable cause in this matter. While the tip led TFO President to Defendant's property, TFO President observed what appeared to be marijuana plants while walking along the border of the fence line— a place where he had a legal right to be independent of any tip and regardless of the validity of the tip. *See United States v. Lubrin*, Criminal Action No. 2014-0056, 2015 WL 361796, at *5 (D.V.I. Jan. 28, 2015) ("[an officer's] conduct of observing a property's curtilage from the public road does not, alone, implicate the Fourth Amendment"); *see also United States v. Chun Yen Chiu*, 857 F. Supp. 353, 359 (D.N.J. 1993) ("As a general rule, it is not unlawful for officers outside the curtilage to observe what occurs thereon."). Given that a determination of probable cause is made

---

[5] Defendant argues, in part, that the tip was unreliable because TFO President did not—upon his follow-up, in-person investigation—find certain details reported by the tipster such as "100 plants in the ground" or "a rasta guy caring for the plants or two pit bull dogs tied up in the yard guarding the farm." (Dkt. No. 48 at 4).

after considering the totality of the circumstances, *Gates*, 462 U.S. at 231, even without the tip, TFO President's plain view observation of the marijuana on Defendant's property establishes probable cause needed for the search warrant.[6] *United States v. Folks*, 452 F. Supp. 3d 238, 255 (W.D. Pa. 2020) (internal citation omitted) ("A warrant may be upheld by a reviewing court if the challenged information is excised from the affidavit and the remaining information continues to support a finding of probable cause for the issuance of the warrant."); *United States v. Christian*, Criminal Action No. 2017-0017, 2018 WL 891401, at *7 (D.V.I. Feb. 14, 2008) (citing *United States v. Whaley*, 781 F.2d 417, 419 (5th Cir. 1986)) ("The mere observation of [marijuana plants] from the road or driveway would not justify entry into the home or curtilage to search and seize property found there … [but] [t]hat would have given probable cause to support a warrant."). Thus, the Court agrees that TFO President's plain view observation of what appeared to be marijuana plants on Defendant's property rendered the tip moot.

### 2. Legality of Aerial Surveillance

#### a. Applicable Legal Principles

The Fourth Amendment protects individuals from "unreasonable searches" in their homes. U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo*, 500 U.S. 565, 580

---

[6] The probable cause analysis here is further augmented by the aerial surveillance discussed below—which TFO President included in his affidavit in support of the application for a search warrant. *See United States v. Merchant*, Criminal Action No. 2018-0017, 2019 WL 3997266, at *8 n.14 (D.V.I. Aug. 23, 2019) (citing *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993) (finding that the search warrant was sufficiently supported by a finding of probable cause as the officer's affidavit "contained ample facts" and "described in detail" circumstances that "evidence of wrongdoing would be found at the premises").

(1991)). Evidence obtained as a result of an unreasonable search or seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (requiring exclusion and suppression of evidence obtained as a result of an unlawful search and seizure).

A search occurs when the government (1) physically intrudes on constitutionally protected areas or (2) invades an expectation of privacy that society recognizes as a reasonable expectation. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013); *Kyllo v. United States*, 533 U.S. 27, 33 (2001). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). Further, courts "regard the area 'immediately surrounding and associated with the home'—what [] cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *accord Estate of Smith v. Marasco*, 318 F.3d 497, 518 (3d Cir. 2003) ("Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property."). To constitute curtilage protected by the Fourth Amendment an area must "harbor[] the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (internal citation and quotations omitted).

However, an area deemed within the curtilage does not itself bar all government activity. *California v. Ciraolo*, 476 U.S. 207, 213 (1986). "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Id.*; *see also Katz v.*

*United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

The Supreme Court has addressed aerial observation of property in the context of the Fourth Amendment. In *Ciraolo*, the Supreme Court held that an aerial observation of a defendant's marijuana grow operation in his garden from an altitude of 1,000 feet where police took pictures with a standard camera did not violate the Fourth Amendment. 476 U.S. at 207. The Court engaged in a two-part inquiry as articulated by Justice Harlan in his concurrence in *Katz*: "[F]irst, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Id.* at 211 (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)); *see also Free Speech Coalition, Inc. v. Att'y Gen. of the United States*, 677 F.3d 519, 543 (3d Cir. 2012). In *Ciraolo*, the government did not dispute the finding of the lower court that the defendant met the first prong of the test. *Id.* As to this first prong, the Supreme Court commented:

> Clearly—and understandably—respondent has met the test of manifesting his own subjective intent and desire to maintain privacy as to his unlawful agricultural pursuits . . . It can reasonably be assumed that the 10-foot fence was placed to conceal the marijuana crop from at least street-level views. So far as the normal sidewalk traffic was concerned, this fence served that purpose, because respondent "took normal precautions to maintain his privacy."

*Id.* (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980)). As to the second prong, the Court stated "that '[the] test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity,' but instead 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.'" *Id.* at 212 (quoting *Oliver*, 466 U.S. at 181-83). While the defendant manifested a subjective expectation of privacy, the Court found the expectation was not reasonable. *Id.* at 214. The Court reasoned that "[t]he observations . . . took place within public navigable airspace . . . in a physically nonintrusive manner . . . Any member

of the public flying in this airspace who glanced down could have seen everything that these officers observed." *Id.* at 213-14.

In *Florida v. Riley*, 488 U.S. 445 (1989), a plurality of the Supreme Court held that there was no Fourth Amendment violation when law enforcement viewed inside a partially open greenhouse from a helicopter flying at an altitude of 400 feet. The plurality found no reasonable expectation of privacy in the greenhouse as the helicopter was flying at the altitude permitted by the law "and there is nothing in the record or before [the Court] to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to respondent's claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude." *Id.* at 451-52.

### b. Analysis

Here, the Government conducted aerial surveillance of Defendant's property and took photographs without a warrant.

Defendant challenges the aerial surveillance as an unconstitutional search on two grounds: (1) that the Government did not provide evidence that the plane was in "public navigable airspace" when TFO President observed and photographed Defendant's property; and (2) that suppression of the evidence is warranted here in accordance with this Court's decision in *United States v. Somme.* (Dkt. No. 48 at 6-7). The Court rejects those arguments.

The record here supports the conclusion that Defendant had a subjective expectation of privacy in their property where the marijuana plants were found. In examining, the subjective expectation of privacy prong of the *Katz* two-part test, a court must determine whether the defendant, by his conduct, has exhibited an actual expectation of privacy. *United States v. Cortez-Dutrieville*, 743 F.3d 881, 884 (3d Cir. 2014) (internal citation and quotation marks omitted); *see*

*also Bond v. United States*, 529 U.S. 334, 338 (2000) ("First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that 'he [sought] to preserve [something] as private.'" (quoting *Smith*, 442 U.S. at 740)). However, all that is required is that "the defendant . . . show that he 'took normal precautions to maintain his privacy.'" *United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) (quoting *Rawlings*, 448 U.S. at 105); *see also United States v. Cardona-Sandoval*, 6 F.3d 15, 20-21 (1st Cir. 1993) ("To demonstrate a 'subjective expectation of privacy,' the Court has required little more than evidence that defendants made some minimal effort to protect their property or activities from warrantless intrusions.").

Here, aerial photographs show that the marijuana plants were located in the backyard which was in close proximity to the home, and the yard was enclosed by fencing and thick foliage.[7] *See Ciraolo*, 476 U.S. at 211 (10-foot fence reflected that respondent "took normal precautions to

---

[7] In its Opposition to the Motion to Suppress, the Government—without much discussion— states that Defendant "Flavius was growing marijuana in an *open field* on his property." (Dkt. No. 35 at 4). In its Supplemental Brief, the Government states in seemingly contradictory fashion, "[t]he defendant was growing marijuana in an *open field* on his property, with no attempts made to hide or conceal anything on the *curtilage*." (Dkt. No. 49 at 8) (emphasis added). Despite the lack of clarity regarding the Government's argument, the Court finds that the marijuana plants were located in the curtilage and not in an "open field." Aerial photographs of Defendant's property show that the marijuana plants were located in close proximity to the home; the marijuana plants were located within the enclosure surrounding the home; and the property was enclosed by fencing—including a galvanized, metal fence—and thick foliage. (Gov't Exs. 1-3); *See Dunn*, 480 U.S. at 294 (it was "plain that the fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house."); *see also United States v. Anderson-Bagshaw*, 509 F. App'x 396, 404 (6th Cir. 2012) (although the backyard was visible through tree line from pole camera location on the vacant lot, court did not find area constituted an open field); *United States v. Romero-Bustamente*, 337 F.3d 1104, 1107-08 (9th Cir. 2003) (backyard that was "small, enclosed, adjacent to [defendant's] house, and located behind his house" fell within the curtilage); *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (citing *United States v. Reilly*, 76 F.3d 1271, 1277-78 (2d Cir. 1995) (finding that backyard constituted curtilage).

maintain his privacy"); *State v. Davis*, 360 P.3d 1161, 1167 (N.M. 2015) ("affirmative steps to exhibit an expectation of privacy [reflected by] ground level 'fencing,' using a combination of vegetation and artificial devices"); *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (erection of fences around the backyard manifested a subjective expectation of privacy). While the marijuana plants were exposed during the aerial surveillance, that alone did not negate Defendant's subjective expectation of privacy. *See Riley*, 488 U.S. at 454 (O'Connor, J., concurring) ("[E]leven individuals who have taken effective precautions to ensure against ground-level observations cannot block off all conceivable aerial views of their outdoor patios and yards without entirely giving up their enjoyment of those areas. To require individuals to completely cover and enclose their curtilage is to demand more than the 'precautions customarily taken by those seeking privacy.'"); *see also Somme,* 2022 WL 4365856, at *11 (collecting similar cases).

Contrary to the Government's contention, the record in this case supports the conclusion that Defendant maintained a subjective expectation of privacy in the surveilled property. The Government argues that in contrast to the property in *Somme,* that was located in a "secluded, rural area, and not surrounded by any other houses," Defendant's property was "adjacent to other homes and right next to public property [—the PAL building—] owned by the [G]overnment of the Virgin Islands." (Dkt. No. 49 at 7-8). However, the Court's opinion in *Somme* does not hold that a defendant's property *must be* located in a secluded, rural area and not surrounded by other homes for a defendant to have a subjective expectation of privacy with respect to that property. In *Somme*, the Court found that seclusion in a rural area is *a* factor that contributed to the conclusion that a subjective expectation of privacy existed. 2022 WL 4365856, at *11.

Next, the Court must determine whether Defendant's subjective expectation of privacy is one that society is willing to recognize as reasonable. *Ciraolo*, 476 U.S. at 211; *United States v.*

*Broadhurst*, 805 F.2d 849, 854 (9th Cir. 1986) ("Should we determine that defendants' subjective expectation was one which society is prepared to recognize as reasonable, then the state's circling overflights rise to the level of a 'search' …"); *Cortez-Dutrieville*, 743 F.3d at 884 ("The objective prong requires a court to determine whether the defendant's 'expectation of privacy is one that society is prepared to recognize as reasonable.'" (quoting *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011))). If "the aerial surveillance took place in an area where the public could legally fly and at an altitude generally used by the public, there would be no reasonable expectation of privacy and thus no offense to the Fourth Amendment.". *United States v. Boyster*, 436 F.3d 986, 992 (8th Cir. 2005). Thus, based on Defendant's "public navigable airspace" challenge, the Court must determine whether the photographs were taken from an altitude where the aircraft had a legal right to be.

In this regard, Defendant contends that the Government failed to provide evidence that the aerial surveillance occurred in navigable airspace consistent with FAA regulations. (Dkt. Nos. 32 at 5 and 48 at 6-7). In his Supplemental Brief, Defendant cites to this Court's recent *Somme* decision in which the Court concluded that the warrantless aerial surveillance was in violation of the Fourth Amendment. (Dkt. No. 48 at 6-7). There, the pilot was unable to testify during cross-examination regarding the altitude at which he was flying over the property. *Somme,* 2022 WL 4365856, at *13. Under those circumstances, the Court concluded that there was no evidence that the aerial surveillance was conducted from a "public vantage point where [the officers] [had] a right to be." *Id.*

Defendant's contention that the instant matter is akin to the situation presented in *Somme* is not well-founded. During the suppression hearing, TFO President testified that he flew over the

property at an altitude of "approximately 2,000 feet."[8] (Dkt. No. 46 at Tr. 15:25). Defendant did not—unlike in *Somme*—cross-examine or otherwise challenge TFO President's testimony. *See Somme*, 2022 WL 4365856, at *13 (noting that the Government could not establish that the aircraft was flying in navigable airspace at the time of the aerial surveillance over defendant's property since pilot testified on cross-examination that he did not know the altitude at which he was flying when he flew over the property). The uncontested evidence of record is, therefore, that the aerial surveillance was conducted at an altitude of approximately 2,000 feet.

Navigable airspace is defined as "airspace above the minimum altitudes of flight prescribed by [FAA regulations]." 49 U.S.C. § 40102(a)(32). Pursuant to FAA regulations, aircrafts must be operated at an altitude of no less than 1,000 feet over congested areas and 500 feet over less congested areas. *See* 14 C.F.R. § 91-119(b) & (c). The Government has therefore established that it was within navigable airspace for either a congested or non-congested area. Accordingly, the record in the instant case establishes that there is evidence that the aerial surveillance was conducted from a "public vantage point where [law enforcement] ha[d] a right to be." *Ciraolo*, 476 U.S. at 213; *United States v. Randolph*, 590 F. Supp. 3d 953, 957 (S.D.W. Va. Mar. 9, 2022) ("In considering the defendant's Fourth Amendment argument, the Court finds that the helicopter was at 500 feet above ground level and within FAA regulations at the time the marijuana was observed.").

---

[8] The Court notes that in the "Affidavit in Support an of an Application for a Search Warrant," TFO President attested that he observed the marijuana plants on Defendant's property "at approximately 2000 ft. in the air." *In the Matter of Search of 59-F Estate Whim Frederiksted St. Croix*, Criminal Action No. 2022-mj-0006 (Dkt. No. 1-1 at ¶ 8).

In view of the foregoing, Defendant's Fourth Amendment challenge—based on his contention that the Government had failed to produce evidence that the aerial surveillance took place from navigable airspace—is rejected.

## B. Fifth Amendment Challenge

### 1. Applicable Legal Principles

The Fifth Amendment to the United States Constitution provides: "No person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479). "When the police fail to give adequate *Miranda* warnings ... any statement made by the individual who is subject to custodial interrogation is inadmissible at trial." *United States v. Brooks*, 358 F. Supp. 3d 440, 476 (W.D. Pa. 2018) (citing *New York v. Quarles*, 467 U.S. 649 (1984)).

*Miranda*'s holding is based on a recognition "that interrogation in certain custodial circumstances is inherently coercive," and suspects must therefore be "specifically informed of [their] *Miranda* rights and freely decide[ ] to forgo those rights" to ensure that the right against compulsory self-incrimination is preserved. *Quarles*, 467 U.S. at 654. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation"

by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion).

A suspect is "in custody" when "'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (internal quotation marks omitted). The Third Circuit has identified several factors that courts should weigh in determining whether an individual is "in custody" during questioning for the purposes of the *Miranda* analysis. These include:

> (1) Whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 436 F.3d 354, 359-60 (3d Cir. 2006) (citing *United States v. Czichray,* 378 F.3d 822, 827 (8th Cir. 2004); *United States v. Hayden,* 260 F.3d 1062, 1066 (9th Cir. 2001); *United States v. Crossley,* 224 F.3d 847, 861 (6th Cir. 2000)). Courts should also consider "the information known by the officer[s] concerning the suspect's culpability" and "whether the officer[s] revealed [their] belief that the suspect was guilty." *Jacobs*, 431 F.3d at 105.

Interrogation, for purposes of Miranda, encompasses not only "express questioning," but also its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Thus, interrogation includes "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 Fed. App'x 119, 126 (3d Cir. 2012). Such conduct includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the

police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-01.

Where a defendant seeks to suppress a statement under *Miranda*, "the [G]overnment bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings." *United States v. Harris*, Criminal No. 07-355, 2008 WL 3545827, at *6 (W.D. Pa. Aug. 12, 2008) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Matlock*, 415 U.S. 164, 178 n.14, (1974)). In other words, it is the Government's burden to establish that it is more likely than not that its version of events is true. *See, e.g.*, *U.S. v. Brunswick*, No. CR.A. 01-66, 2002 WL 31466451, at *5 (D. Del. Nov. 4, 2002) (finding that "regardless of what had actually transpired" the government had failed to meet its burden to show that it was "more likely than not" that defendant's statements to law enforcement in elevator were spontaneous rather than the result of direct questioning where *Miranda* warnings were not provided in advance of those statements). As discussed below, this case presents a textbook example of the Government's apparent failure to appreciate its burden, and its unmistakable failure to carry that burden under the circumstances here.

### 2. Analysis

Defendant asserts that he was subject to custodial interrogation when he made the statement admitting ownership of the marijuana plants, and he was not *Mirandized* prior to making the statement. (Dkt. No. 48 at 6). Defendant therefore contends that his statement should be suppressed. The Government argues that Defendant—without any prompting by TFO President— made a "spontaneous utterance" and admitted to ownership of the marijuana on his own accord.

(Dkt. No. 49 at 4). The Government therefore contends that Defendant was not subject to interrogation and *Miranda* warnings were not required. *Id.*

During the evidentiary hearing, the testimonies of TFO President and Defendant differed regarding the interaction between them. TFO President testified as follows:

> **Q:**   …Did you have any interactions with Mr. Flavius that day?
> **A:**    Yes, I did.
> **Q:**   Could you please describe that for the Court [?]
> **A:**   At one point when the area was cleared and deemed safe by the entry team, I approached Mr. Flavius and his wife on the outside of the house, and as I normally do, I introduced myself. I'm Task Force Officer or Detective Moses President, and this is my search warrant …
> …
> **Q:**   And what, if anything, did Mr. Flavius say to you?
> **A:**   Well, we didn't ask anything. Mr. Flavius stated that everything was his, all the plants are his.
> **Q:**   Ok, [a]nd did you question him about this?
> **A:**   I did not.
> **Q:**   …[A]fter he made that statement about the plants being his, did you question him after that?
> **A:**   No, I did not.

(Dkt. No. 46 at Tr. 20:6-Tr. 21:2).

On direct examination, Defendant described his interaction with TFO President as follows:

> **Q:**   Can you tell the Judge what happened when they showed up at your house that morning?
> **A:**   Yes, Sir. When I wake up in the morning, I looked through my window and I see a government vehicle coming, so I leave my room and come to the kitchen[,] and I open[ed] the door. When I open[ed] the door, the man that [was] driving put [his] gun on me, so I put my hands up. But once I [was] there, I see a whole 20 something vehicles come driving to my home.
> **Q:**   Now, did you ever see Officer President that morning?
> **A:**   Yeah, I saw Mr. President. He c[a]me to me [,] [and] he asked me if [I] live[d] there, I [told] him, yes.
> **Q:**   He asked you what?
> **A:**   He asked me if [I] liv[e] in this place? ... I [told] him, yes.
> **Q:**   Now, did you recognize Mr. President?
> **A:**   Yes, because I know him from a long time. When my son [was] killed, he was in my house.

19

|   | … |
|---|---|
| **Q:** | Are you married to his cousin? |
| **A:** | Yes. |
|   | … |
| **Q:** | Did he ask you any questions? |
| **A:** | Yes. |
| **Q:** | What did he ask you? |
| **A:** | He [took] me where the garage is where he was standing, and he take me to the balcony close by my room, my wife and I. So he asked me, "who is planting this thing here?" So I [told] him is me. So when I tell him is me, he tell me, "[M]an, I didn't know it's you." I say, "[W]ell, it's me that grow it." |
| **Q:** | Did he advise you of your rights? |
| **A:** | He didn't read me my rights. |

*Id.* at 45:21-47:10.

Based on the record, the Court finds that the Government has not met its burden to show by a preponderance of the evidence that Defendant was not subject to interrogation for purposes of *Miranda*. While the Government relies on the testimony of TFO President, the Government completely ignores the fact that Defendant provided contrary testimony. Following Defendant's testimony, the Government did not cross-examine Defendant or otherwise present any rebuttal evidence to challenge the divergence between TFO President's and Defendant's testimony regarding whether TFO President asked Defendant about ownership of the marijuana. Thus, notwithstanding that the Government bears the burden of proof, it did nothing whatsoever to demonstrate—or otherwise assist the Court in concluding—that it is more likely than not that TFO President's version of events is more credible than that of Defendant. Instead, the Government simply relied on the Court's responsibility to assess credibility to determine whether to give more weight to TFO President's or Defendant's testimony on the issue of whether TFO President prompted Defendant's statement by asking him a question. *Id.* at 69:19-70:11.[9] While the Court

---

[9] In oral argument, the Government had little more to state than the obvious: if the Court gave more weight to TFO President's testimony that he did not question Defendant, then the Court

fully accepts the responsibility of assessing credibility, it relies on the evidence presented and its observation of the witnesses in making its assessment.

Here, the Court concludes that, without more, the competing testimonies stand on equal footing. In other words, the Court cannot conclude that the Government has met its burden of showing by a preponderance of the evidence that there was not an interrogation for purposes of *Miranda*. Accordingly, the Court will credit the testimony of Defendant that he was questioned by TFO President before acknowledging that he planted the marijuana on his property. Because questioning a suspect as to whom drugs belong constitutes conduct that is "intentionally designed to evoke a confession," *Bonner*, 469 Fed. App'x at 126, or "reasonably likely to elicit an incriminating response," *Innis*, 446 U.S. at 301, the Court finds that Defendant was interrogated. *See, e.g., United States v. Almonte*, 348 F. Supp. 3d 402, 406-08 (E.D. Pa. 2018) (finding that the defendant was subject to interrogation where police asked him whether illegal drugs police had discovered belonged to him); *United States v. Young*, No. 15-CR-60328, 2016 WL 11431025, at *5 (S.D. Fla. Nov. 8, 2016) (same); *United States v. Avila*, No. 01-CR-01131, 2002 WL 35650128, at *6 (D.N.M. Jan. 31, 2002) (same); *United States v. Green*, 776 F. Supp. 565, 568 (D.D.C. 1991) (same).

Having determined that the Government has not met its burden of proving that Defendant was not interrogated, the Court turns to the issue of custody.[10] In analyzing this issue, the Court will review the *Willaman* factors.

---

would find that TFO President had not interrogated Defendant and would not need to ascertain whether Defendant was in custody for purposes of *Miranda*. *Id.* at 71:9-71:20.

[10] Even worse than the Government's seemingly complacent attitude toward its burden of proving that Defendant was not interrogated, was its total lack of preparedness to address the issue of whether there was a *custodial* interrogation. *See* Dkt. No. 46 at Tr. 66:4-Tr. 66:17. At no point during the hearing did the Government offer arguments concerning whether Defendant was in

The first *Willaman* factor—whether the officers told the suspect he was under arrest or free to leave—weighs in favor of a finding that Defendant was in custody at the time he made the statement regarding ownership of the marijuana plants. The Third Circuit has observed that where a suspect is "not told anything regarding [his] arrest, pro or con," the first *Willaman* factor "falls somewhat in [his] favor." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005). Based on the record, there is no evidence that indicates that Defendant was told that he was either under arrest or free to leave. Thus, the first factor weighs in favor of a finding that Defendant was in custody when he made the incriminating statement.

The second *Willaman* factor—the location or physical surroundings of the interrogation—weighs in the Government's favor. Courts have generally found that an interrogation occurring within the confines of one's home lessens the coercive nature of the interaction. *See United States v. Killingsworth*, 118 F. App'x 649, 651-52 (3d Cir. 2004) ("'[A]n interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody.'" In *Willaman*, the Third Circuit found that "[w]hen a person is questioned *on his own turf* ... the surroundings are not indicative of the type of inherently coercive settings that normally accompanies custodial interrogation." 437 F.3d at 360 (quoting *Czichray*, 378 F.3d at 826) (emphasis added). Here, by Defendant's own acknowledgment, TFO President, Defendant, and his wife were standing in the area of the garage, on the balcony, near

---

custody at the time he made the incriminating statement. Instead, the Government proceeded as if it need not address the issue of custody until the Court resolved the interrogation issue against it. *See id.* at 72:8-72:18. Thus, when unable to respond to custody-related questions during the oral argument following the hearing, the Government requested the opportunity to submit supplemental briefing, which the Court granted. *See id.* at 89:17-90:7 (Court: "My question was, is the Government conceding that there was custody … since there was no testimony at all by the Government on that … [?]" Government counsel: "The only reason I'm hesitating on this is that I would, as I indicated earlier, … want an opportunity to look at the case law before making that concession.").

his room—or on Defendant's *own turf*—during the time he made the statement. *See United States v. Benjamin*, Criminal Action No. 2017-0010, 2018 WL 6840150, at *10 (D.V.I. Dec. 30, 2018) (finding second *Willman* factor weighed against finding of custody because defendant's encounter with law enforcement occurred on his property and near residence). Thus, this factor weighs in favor of the Government.

The third *Willaman* factor—the length of the encounter between TFO President and Defendant—does not indicate a custodial situation and weighs in favor of the Government. Based on the testimony of both TFO President and Defendant, their interaction was brief in nature. TFO President stated that after he approached Defendant and his wife, Defendant admitted to ownership of the marijuana plants. (Dkt. No. 46 at Tr. 20:19-Tr 20:21). Defendant said that TFO President asked him whether he lived on the Property and "Who is planting this thing here?" *Id. at* 46:7-46:8; 47:2-47:6. Since "courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial," *Killingsworth*, 118 F. App'x at 651-52 (listing cases), such a brief encounter as occurred here does not support a finding of custody.

The fourth factor—whether law enforcement used coercive tactics—weighs in favor of Defendant. During the hearing, both TFO President and Defendant testified that they knew each other because Defendant's wife and TFO President are cousins. (Dkt. No. 46 at Tr. 18:16-Tr. 18:21). Defendant also testified that TFO President had previously investigated the murder of Defendant's son and TFO President said—after Defendant admitted to owning the marijuana—"[M]an, I didn't know [it was] you." *Id.* at 46:13-47:10. The prior relationship between Defendant and TFO President, along with this exchange—as acknowledged by Defendant—would suggest that the communication with Defendant was not hostile in nature.

However, the Government did not offer any evidence to counter Defendant's suggestion that other coercive tactics were at play during TFO President's encounter with Defendant. According to Defendant, "20 something" law enforcement vehicles entered his property, and "when [Defendant] open[ed] the door, the man that [was] driving put [his] gun on me." *Id.* at 46:1-46:4. At no point during the suppression hearing did the Government challenge or contradict Defendant's testimony, or in the alternative, provide evidence that law enforcement was not brandishing their weapons at the time Defendant made the incriminating statement. In fact, at the suppression hearing, counsel for the Government stated that "[i]t was unclear to [him] from [Defendant's] testimony at what points guns were drawn." *Id.* at 88:6-88:7.[11] Then, in its Supplemental Brief, the Government could say no more than that the gun being drawn on Defendant "*appears* to have taken place before the period of time when the [D]efendant and TFO [President] spoke to each other." (Dkt. No. 49 at 6) (emphasis added). The Government's own uncertainty about the factual circumstances surrounding the interaction between TFO President and Defendant demonstrates that it failed to show that coercive tactics were not used. Therefore, the Court concludes that the fourth *Willaman* factor weighs in favor of Defendant.

The fifth *Willaman* factor—whether the suspect voluntarily submitted to questioning—also weighs in favor of Defendant. As discussed above, the record shows that weapons were drawn at least upon entry on Defendant's property, (Dkt. No. 46 at Tr. 46:1-Tr. 46:2), and the Government has failed to establish that weapons were not drawn during the interaction between TFO President and Defendant. Such brandishing of weapons would "involve the type of physical intimidation or psychological coercion which would render [Defendant's] statements involuntary." *Killingsworth*,

---

[11] Of course, the Government had the opportunity to either cross-examine Defendant or present rebuttal evidence following Defendant's testimony to clarify what was deemed "unclear." The Government did neither.

118 F. App'x at 652. Because of the Government's failure to meet its burden to show that Defendant's statement was voluntary, the Court finds that the fifth *Willaman* factor weighs in favor of Defendant.

Further, the considerations noted in *Jacobs*—namely, "the information known by the [interrogating] officer concerning the suspect's culpability," and "whether the officer revealed his belief that the suspect was guilty," 431 F.3d at 105—weigh in favor of Defendant. TFO President had considerable knowledge of Defendant's culpability based upon his plain view observation of marijuana plants while walking the fence line of Defendant's property; his observation of the marijuana plants on Defendant's property during the aerial surveillance; and the discovery of the marijuana plants during the search of Defendant's property. The discovery of the marijuana plants by law enforcement—was known to Defendant and, as would any reasonable person in his circumstances, Defendant undoubtedly knew that TFO President believed him to be guilty. *See Stansbury v. California*, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."). Therefore, "a reasonable person in [Defendant's] position would have felt as if [he] was either under arrest or could have been placed under arrest at any moment." *United States v. Aker*, No. 16-CR-00206, 2018 WL 501001, at *7 (M.D. Pa. Jan. 22, 2018). Thus, the *Jacobs* factors weigh in favor of Defendant.

In view of the foregoing, two *Willaman* factors favor the Government and three factors favor Defendant. Further, both *Jacobs* factors favor Defendant. Considering the totality of the circumstances, the Court finds that the Government has failed to carry its burden of showing that Defendant was not in custody for purposes of *Miranda*.

Because the Government has failed to carry its burden of showing that Defendant's statement was not the product of custodial interrogation without *Miranda* warnings, the Court will suppress Defendant's statement admitting to ownership of the marijuana plants.

### III.   CONCLUSION

For the reasons discussed above, the Court will grant in part and deny in part Defendant's "Motion to Suppress" (Dkt. No. 32). The Court will suppress Defendant's statement admitting to ownership of the marijuana plants, and will deny suppression of the marijuana plants and the aerial photographs.

An appropriate Order accompanies this Memorandum Opinion.

Date:   May 28, 2023

_____/s/_____
WILMA A. LEWIS
District Judge

26